[Cite as *State v. Allen*, 2022-Ohio-3493.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No.  WD-21-069

     Appellee                                Trial Court No.  2019CR0527

v.

Matthew David Allen                             **DECISION AND JUDGMENT**

     Appellant                               Decided:  September 30, 2022

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} Appellant, Matthew Allen, appeals the judgment of the Wood County Court

of Common Pleas, convicting him, following a jury trial, of one count of involuntary

manslaughter, one count of corrupting another with drugs, one count of reckless

homicide, one count of trafficking in fentanyl, and one count of possessing criminal tools. For the reasons that follow, we affirm.

## I. Facts and Procedural Background

{¶ 2} On November 21, 2019, the Wood County Grand Jury entered a five-count indictment against appellant, charging him with one count of involuntary manslaughter in violation of R.C. 2903.04(A) and (C), a felony of the first degree; one count of corrupting another with drugs in violation of R.C. 2925.02(A)(3) and (C)(1), a felony of the second degree; one count of reckless homicide in violation of R.C. 2903.041(A) and (B), a felony of the third degree; one count of trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(1) and (C)(9)(c), a felony of the fourth degree; and one count of possessing criminal tools in violation of R.C. 2923.24(A) and (C), a felony of the fifth degree. The charges stemmed from appellant's alleged provision of drugs to S.M., who later died of a fentanyl-related overdose.

{¶ 3} Appellant entered an initial plea of not guilty, and the matter proceeded to a jury trial. At the trial, the following evidence was presented.

{¶ 4} Sergeant Jody Swoap of the Wood County Sheriff's Office testified that on December 4, 2018, he responded to a residence in Wood County, Ohio, for a call of a possible overdose. Swoap testified that when he arrived at the scene, the victim, S.M., had already been transported to the hospital. When Swoap went to the hospital to check on the status of S.M., he learned that S.M. was deceased. While at the hospital, Swoap

2.

was given a pill bottle that contained the drugs that the family believed S.M. had taken. The pill bottle contained pills, but it also contained a plastic baggie with a white substance in it. On cross-examination, Swoap testified that when he was at the victim's residence, he did not observe any drug instruments or paraphernalia near where the victim was found.

{¶ 5} The victim's sister, D.P. testified next. D.P. testified that S.M. had mental health issues following the death of S.M.'s husband. According to D.P., S.M. was using drugs, and that affected her relationship with the family. On December 4, 2018, D.P. went into S.M.'s home, and found S.M. unresponsive on the couch. 911 was called, and D.P. and her boyfriend moved S.M. to the ground, where the boyfriend performed CPR. Knowing that S.M. was battling addiction, D.P. threw the cushions off of the couch looking for drugs, and she discovered the pill bottle with the plastic baggie under the cushion where S.M. had been laying. The pill bottle and plastic baggie were then provided to the EMS and rescue workers, and transported to the hospital with S.M. On cross-examination, D.P. testified that she was concerned about the company that S.M. was keeping. In particular, D.P. was concerned with a person named "Juice," but D.P. testified that appellant was not "Juice."

{¶ 6} The next person to testify was Samuel Fortener, a forensic scientist at the Ohio Bureau of Criminal Investigation ("BCI"), and an expert witness regarding

scientific analysis of controlled substances. Fortener testified that the white substance in the plastic baggie was found to contain cocaine and fentanyl.

{¶ 7} Detective Sergeant Ryan Richards of the Wood County Sheriff's office testified regarding his investigation. Richards testified that he submitted the plastic baggie and personal items from S.M.'s residence, such as her hairbrush, to BCI for DNA comparison. Richards testified that the plastic baggie contained DNA matching S.M., as well as DNA that presumptively matched appellant. Richards then obtained a warrant to collect a DNA sample from appellant, which was then submitted to the lab.

{¶ 8} In addition to the DNA evidence, Richards conducted an investigation into S.M.'s Facebook and cell phone records. S.M.'s Facebook records showed that on the morning of December 2, 2018, she messaged appellant seeking to obtain a drug known as "Molly." Appellant replied that he did not know anyone who could get the drug. Over the course of the day, and into the night, S.M. conveyed to appellant her feelings of pain and helplessness, and her thoughts of suicide. Appellant attempted to console S.M., and encouraged her that she was strong and a good person. He told her that drugs would not help her, and that things would get better, and that she would get better.

{¶ 9} The next morning, December 3, 2018, appellant messaged S.M. to see how she was doing. S.M. was still distraught, at one point claiming, "I'm to the point I want to do heroine (sic) and die," and "I'm going to find it and end it." Around that time, S.M. began to send text messages to appellant's phone, asking if he knew where to get "china,"

4.

which Richards testified was a street name for heroin.  At approximately 11:45 a.m., appellant replied, "Yeah I'll bring ya some China after I get off work.  And by China I mean a knuckle sandwich!"  At the same time, appellant sent a Facebook message to S.M., telling her "Stop!"  S.M. persisted in asking for drugs, inquiring into the amount and cost, eventually saying that she wanted $100 worth.  Appellant replied at 12:27 p.m., "I'm not bring you china bro.  I said I bring you a knuckle sandwich instead."  Appellant then texted, "I don't even know where to get any china."

{¶ 10} A few hours later, at 2:39 p.m., appellant texted S.M., "Idk.  Maybe I can help ya find it.  I get off at 530.  If ya still want something."  S.M. responded, "Chi," which Richards testified was a short name for "china," and appellant replied, "Yeah."  An hour later, at 3:41 p.m., appellant texted S.M., "If ya still want that I come pick up money in a couple hours."  S.M. replied, "Ok."  At 5:05 p.m. appellant reached out to S.M. through Facebook, stating "Yo."  Four minutes later, at 5:09 p.m., appellant texted S.M., asking "[S.M.].  You want that?"  At 5:18 p.m. S.M. responded through both text message and Facebook that she wanted "H," which Richards testified was another slang for heroin.  At 5:24 p.m., appellant replied, "Oh.  I be there in a few minutes."

{¶ 11} At approximately 10:00 p.m. that night, S.M. texted appellant, stating "I only did that one line it was fire."  Richards explained that "fire" referred to the strength of a high and how close it was to an addict's first experience.  Appellant responded at

10:06 p.m., "Be careful." S.M. replied, "I will I'm not doing no more till tomorrow." The two then discussed S.M. acquiring some "Molli."

{¶ 12} On the morning of December 4, 2018, appellant again inquired about "Molli." The two discussed the drug, with S.M. stating that she had both "hard and soft." At 11:47 a.m. appellant texted S.M., asking "Did Molli ever show up?" S.M. never responded. Appellant's last messages to S.M. occurred close to 7:00 p.m., when he sent text and Facebook messages asking S.M. if she was okay. At that point, S.M. was already deceased.

{¶ 13} On cross-examination, Richards testified that two individuals were observed entering S.M.'s home on December 4, 2018. One of them was identified as "Juice," and the other was identified as B.M., who was purportedly in a relationship with S.M. Appellant was not seen entering S.M.'s residence. Richards also testified that S.M.'s phone records showed that she made numerous inquiries to other people on December 3, 2018, seeking to purchase drugs. Richards testified that he did not pursue those other conversations, but focused his inquiry on her conversation with appellant.

{¶ 14} The next witness to testify was Emily Feldenkris, a forensic scientist at BCI, and an expert witness in scientific and forensic DNA analysis. Feldenkris testified that the plastic baggie that was found in the pill bottle contained two major DNA contributors. One of the contributors matched the DNA profile found on the items in S.M.'s house, the other contributor matched appellant's DNA profile.

6.

**{¶ 15}** The final witness to testify was Dr. Robert Forney, the chief forensic toxicologist of the Lucas County Coroner's Office, and an expert witness in forensic toxicology. Dr. Forney testified that S.M. died shortly after ingesting the fentanyl, and that but for the fentanyl, S.M. would not have died.

**{¶ 16}** Thereafter, the state rested. Appellant moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. Appellant then rested without calling any witnesses. Following closing arguments and jury instructions, the jury returned with a verdict of guilty on all counts.

**{¶ 17}** At sentencing, the trial court merged the counts of involuntary manslaughter, corrupting another with drugs, and reckless homicide, and the state elected to proceed to sentencing on the count of involuntary manslaughter. The court then sentenced appellant to a total combined prison term of 11 years, and ordered that his sentence be served consecutively to a previously imposed sentence in a separate case.

## II. Assignments of Error

**{¶ 18}** Appellant has timely appealed his judgment of conviction, and now asserts two assignments of error for our review:

> 1. The trial court erred to the prejudice of appellant in denying his Rule 29 motion.

> 2. The jury's verdict was against the manifest weight of evidence presented at trial.

7.

## III. Analysis

{¶ 19} In his first assignment of error, appellant argues that the trial court erred in denying his Crim.R. 29 motion for acquittal. Crim.R. 29(A) provides for an entry of judgment of acquittal "if the evidence is insufficient to sustain a conviction." "An appellate court reviews a denial of a Crim.R. 29 motion for acquittal using the same standard that is used to review a sufficiency of the evidence claim." *State v. Reyes*, 6th Dist. Wood No. WD-03-059, 2005-Ohio-2100, ¶ 21, citing *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995). In reviewing a sufficiency of the evidence claim, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 20} Appellant argues that his convictions for involuntary manslaughter, corrupting another with drugs, and reckless homicide were based upon insufficient evidence. We will first address appellant's conviction for involuntary manslaughter. R.C. 2903.04(A) provides, "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." Appellant argues that the state did not introduce sufficient evidence that the drugs he obtained for S.M. were the proximate cause of her death. Appellant asserts that "there is no way to know beyond a reasonable doubt that the

8.

pill bottle containing drugs, found by S.M.'s sister, D.P., and linked to Appellant by his DNA, were the actual drugs that caused S.M.'s death." We disagree.

{¶ 21} Here, the evidence reveals that on December 2 and 3, 2018, S.M. was telling appellant about her desire for drugs, and was asking appellant for heroin. Appellant initially rebuffed S.M.'s requests, telling her he would bring her a knuckle sandwich instead. Appellant then claimed that he did not even know where to get heroin. However, on the afternoon of December 3, 2018, appellant had an apparent change of heart and messaged S.M., "Idk. Maybe I can help ya find it. I get off at 530. If ya still want something." Appellant then confirmed he was talking about heroin. An hour or so later, appellant again asked if S.M. still wanted the drugs, and said that he would be coming to pick up the money. At 5:24 p.m., appellant told S.M. that he would be there in a few minutes. Several hours later, at approximately 10:00 p.m., S.M. texted appellant to tell him that she only did one line, and that it was "fire." Appellant told her to "be careful."

{¶ 22} When S.M. overdosed and died the next day, the only drugs found on or near her was the pill bottle containing the plastic baggie. The white substance in the baggie tested positive for cocaine and fentanyl. Dr. Fortney testified that but for the fentanyl, S.M. would not have died. The plastic baggie was tested and found to have two major contributors of DNA. One of those contributors was S.M., the other was appellant.

9.

{¶ 23} From this evidence, we find that a rational juror could have found beyond a reasonable doubt that appellant provided drugs to S.M., that the drugs contained fentanyl, and that S.M.'s ingestion of the fentanyl was the proximate cause of her death. Therefore, we hold that appellant's conviction for involuntary manslaughter is supported by sufficient evidence.

{¶ 24} Appellant also argues that the jury's findings of guilt on the merged counts of corrupting another with drugs and reckless homicide were based upon insufficient evidence. However, "[w]hen counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless." *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990). Thus, because we find that appellant's conviction for involuntary manslaughter is based upon sufficient evidence, we are precluded from considering the sufficiency of the evidence arguments for the other merged counts of corrupting another with drugs and reckless homicide.

{¶ 25} Accordingly, appellant's first assignment of error is not well-taken.

{¶ 26} In his second assignment of error, appellant argues that his convictions were against the manifest weight of the evidence. When reviewing a manifest weight claim,

> [t]he court, reviewing the entire record, weighs the evidence and all
> reasonable inferences, considers the credibility of witnesses and determines
> whether in resolving conflicts in the evidence, the jury clearly lost its way
> and created such a manifest miscarriage of justice that the conviction must
> be reversed and a new trial ordered. The discretionary power to grant a
> new trial should be exercised only in the exceptional case in which the
> evidence weighs heavily against the conviction.

*State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 27} Here, appellant again contends that the evidence does not show that he was the one who provided the fatal drugs to S.M. Appellant argues that S.M. reached out to multiple individuals seeking to obtain drugs around the time of December 3, 2018, and that she may have been successful. In addition, appellant notes that he was never seen around S.M.'s residence near the time of her death, but that "Juice" and B.M. were seen at her house. Finally, appellant states that because no drug paraphernalia was found at S.M.'s home, and because appellant was never seen at S.M.'s home, it calls into question when the fatal drugs were provided to her and how they were administered.

{¶ 28} Upon our review of the evidence as a thirteenth juror, we find that the jury did not clearly lose its way and create a manifest miscarriage of justice. As discussed above, the text and Facebook messages establish that although appellant originally

resisted providing drugs to appellant, he relented, and offered to procure drugs for her. Less than five hours after appellant told S.M. that he would be over in a few minutes, S.M. messaged appellant and told him, "I only did that one line it was fire." Appellant replied, "Be careful." Given the context of the conversation, we find that when speaking of "that one line," S.M. was referring to the drugs that appellant provided. This is further corroborated by the fact that S.M. died of a fentanyl overdose the next day, and the only drugs found on or near S.M. were the bottle of pills and the plastic baggie containing cocaine and fentanyl. Appellant's DNA was on the plastic baggie, along with S.M.'s. The totality of the evidence supports the conclusion that appellant provided the baggie containing cocaine and fentanyl to S.M., and that S.M. died as a result of ingesting the fentanyl. Therefore, we hold that appellant's convictions are not against the manifest weight of the evidence.

{¶ 29} Accordingly, appellant's second assignment of error is not well-taken.

### IV. Conclusion

{¶ 30} On consideration whereof, we find that substantial justice has been done the party complaining, and the judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.

Christine E. Mayle, J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE


_____
JUDGE


_____
JUDGE


This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.